COPY

Craig S. Summers (SBN 108,688)
craig.summers@kmob.com
Joseph S. Cianfrani (SBN 196,186)
joe.cianfrani@kmob.com
Irfan A. Lateef (SBN 204,004)
irfan.lateef@kmob.com
Brian C. Claassen (SBN 253,627)
brian.claasen@kmob.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
**INTOUCH TECHNOLOGIES, INC.**
**D/B/A INTOUCH HEALTH**

FILED

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
2011 NOV -4  PM 12: 41
BY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTOUCH TECHNOLOGIES, INC. D/B/A INTOUCH HEALTH, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> VGO COMMUNICATIONS, INC., a Delaware corporation, <br><br> Defendant. | Case No. **CV11 - 9185 PA (AJWx)** <br><br> **COMPLAINT FOR PATENT INFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff InTouch Technologies, Inc. d/b/a InTouch Health ("Plaintiff" or "InTouch") for its Complaint against Defendant VGo Communications, Inc. ("Defendant" or "VGo Communications"), alleges as follows:

## I.  THE PARTIES

1.     Plaintiff InTouch is a Delaware corporation having a principal place of business at 6330 Hollister Avenue, Santa Barbara, California 93117.

2.     Upon information and belief, Defendant VGo Communications is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 100 Innovative Way, Suite 3321, Nashua, New Hampshire 03062.

3.     Upon information and belief, VGo Communications conducts business in this Judicial District, and has committed acts of infringement in this District.  Specifically, at least Glendale Adventist Medical Center in Glendale, California is a user of the VGo robot system.

## II.  JURISDICTION AND VENUE

4.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq*., more particularly 35 U.S.C. § 271 and § 281.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b).

## III.  CLAIMS FOR PATENT INFRINGEMENT
## FIRST CLAIM FOR RELIEF
### (Infringement of U.S. Patent No. 6,925,357)

7.     InTouch realleges and reincorporates the allegations set forth in paragraphs 1 through 6.

8.     InTouch is the owner by assignment of U.S. Patent No. 6,925,357

- 1 -

entitled "Medical Tele-Robotic System" ("the '357 Patent"), which the United States Patent and Trademark Office lawfully and duly issued on August 2, 2005. On May 11, 2010 the United States Patent and Trademark Office issued a reexamination certificate for the '357 Patent. A copy of the '357 Patent with its reexamination certificate is attached hereto as Exhibit 1.

9.     VGo Communications has in the past and is currently directly infringing the '357 Patent by, without authority, making, using, offering to sell, or selling, within the United States, or importing into the United States, certain products that embody one or more claims of the '357 Patent, including without limitation the VGo robot system. The VGo robot system infringes several claims of the '357 Patent, including, but not limited to, at least claims 79 and 83. VGo Communications' acts constitute direct infringement of the '357 Patent in violation of 35 U.S.C. § 271(a).

10.     VGo Communications actively induces infringement of the '357 Patent in violation of 35 U.S.C. § 271(b). VGo Communications had knowledge of the '357 Patent at least as early as September 28, 2010. On information and belief, with knowledge of the patent, VGo Communications provided instructions in a User's Guide for others, such as customers and other end-users, to use the VGo robot systems to directly infringe at least claims 79 and 83 of the '357 Patent. For example, the VGo robot system is a mobile robot that has a camera and a monitor. VGo Communications provides instructions for a customer to use a first remote station and a second remote station to access the VGo robot. The VGo robot system also includes an arbitrator that can control access to the mobile robot by the first and second remote stations as claimed. Furthermore, upon information and belief, VGo Communications knew that these instructions and activities would cause direct infringement of the '357 Patent by its customers.

11.     VGo Communications is also in violation of 35 U.S.C. § 271(c) for

- 2 -

contributing to the direct infringement of the '357 Patent by others, such as customers and other end-users of VGo robots.   VGo Communications had knowledge of the '357 Patent at least as early as September 28, 2010.   VGo Communications is a contributory infringer because, among other things, it offers to sell and/or sells within the United States, components of infringing robot systems, including but not limited to the VGo robot, remote user software, and VGoNet service, that constitute material parts of at least claims 79 and 83 of the '357 Patent.   These components are not staple articles or commodities of commerce suitable for substantial non-infringing use, and, upon information and belief, are known by VGo Communications to be especially made or especially adapted for use in infringement of the '357 Patent.   For example, VGo Communications offers to sell and/or sells within the United States the VGo robot, a mobile robot that has a camera and a monitor, remote user software for a customer to install on a first and second remote station that can access the mobile robot, and the VGoNet service that that are material parts of at least claims 79 and 83 of the '357 Patent.   Upon information and belief, such components are used by others, including customers and other end-users of VGo robots, in connection with infringing robot systems in the United States, thereby constituting direct infringement of the '357 Patent.   Upon information and belief, VGo Communications knew that the offer for sale, sale, importation, or use of such components would constitute an infringement.

12.   Upon information and belief, the infringement by VGo Communications has been willful, intentional and deliberate with full knowledge of the '357 Patent, entitling InTouch to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285. VGo Communications had knowledge of the '357 Patent at least as early as September 28, 2010 and continued to infringe despite an objectively high likelihood that at least its VGo robot system infringed the '357 Patent.   The risk

of infringement of the '357 Patent was either known to VGo Communications or so obvious that it should have been known.

13.     Upon information and belief, InTouch has been and will continue to be injured by VGo Communications' infringement of the '357 Patent, and such acts will continue unless VGo Communications is enjoined therefrom.

14.     Upon information and belief, VGo Communications has derived, received, and will continue to derive and receive gains, profits and advantages from the aforesaid acts of infringement in an amount that is not presently known to InTouch.   By reason of the aforesaid infringing acts, InTouch has been damaged, and is entitled to monetary relief in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 6,346,962)

15.     InTouch realleges and reincorporates the allegations set forth in paragraphs 1 through 6.

16.     InTouch is the owner by assignment of U.S. Patent No. 6,346,962 entitled "Control of Video Conferencing System with Pointing Device" ("the '962 Patent"), which the United States Patent and Trademark Office lawfully and duly issued on February 12, 2002.   A copy of the '962 Patent is attached hereto as Exhibit 2.

17.     Upon information and belief, VGo Communications has in the past and is currently directly infringing the '962 Patent by, without authority, making, using, offering to sell, or selling, within the United States, or importing into the United States, certain products that embody one or more claims of the '962 Patent, including without limitation the VGo robot system.  The VGo robot system infringes several claims of the '962 Patent, including, but not limited to, at least claims 1 and 8.   VGo Communications' acts constitute direct infringement of the '962 Patent in violation of 35 U.S.C. § 271.

18.     VGo Communications actively induces infringement of the '962

- 4 -

1  Patent in violation of 35 U.S.C. § 271(b).   VGo Communications had
2  knowledge of the '962 Patent at least as early as September 28, 2010.   On
3  information and belief, with knowledge of the patent, VGo Communications
4  provided instructions in a User's Guide for others, such as customers and other
5  end-users, to use VGo robot systems to infringe at least claim 8 of the '962
6  Patent.   For example, the VGo robot system is a system for controlling
7  operations of a video conferencing system.   The VGo robot includes a camera
8  capable of remote control operation.   VGo Communications provides
9  instructions for a customer to install a personal computer application for
10 controlling the camera.   In at least the "Look Around" mode, the infringing
11 system includes the claimed means for controlling in real time the operation of
12 the camera, actuating the camera, and stopping motion of the camera.
13 Furthermore, upon information and belief, VGo Communications knew that
14 these instructions and activities would cause direct infringement of the '962
15 Patent by its customers using the VGo robot systems.

16        19.    VGo Communications is also in violation of 35 U.S.C. § 271(c) for
17 contributing to the direct infringement of the '962 Patent by others, such as
18 customers and other end-users of VGo robots.   VGo Communications had
19 knowledge of the '962 Patent at least as early as September 28, 2010.   VGo
20 Communications is a contributory infringer because, among other things, it
21 offers to sell and/or sells within the United States, components of infringing
22 systems for controlling operations of video conferencing systems, including but
23 not limited to the VGo robot, user software, and VGoNet service, that constitute
24 material parts of at least claims 1 and 8 of the '962 Patent.   These components
25 are not staple articles or commodities of commerce suitable for substantial non-
26 infringing use, and, upon information and belief, are known by VGo
27 Communications to be especially made or especially adapted for use in
28 infringement of the '962 Patent.   For example, VGo Communications offers to

sell and/or sells within the United States the VGo robot with a camera capable of remote control operation, remote user software for a customer to install, and the VGoNet service that that are material parts of at least claims 1 and 8 of the '962 Patent. Upon information and belief, such components are used by others, including customers and other end-users of VGo robots, in connection infringing systems in the United States, thereby constituting direct infringement of the '962 Patent. Upon information and belief, VGo Communications knew that the offer for sale, sale, importation, or use of such components would constitute an infringement.

20. Upon information and belief, the infringement by VGo Communications has been willful, intentional and deliberate with full knowledge of the '962 Patent, entitling InTouch to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285. VGo Communications had knowledge of the '962 Patent at least as early as September 28, 2010 and continued to infringe despite an objectively high likelihood that at least its VGo robot system infringed the '962 Patent. The risk of infringement of the '357 Patent was either known to VGo Communications or so obvious that it should have been known.

21. Upon information and belief, InTouch has been and will continue to be injured by VGo Communications' infringement of the '962 Patent, and such acts will continue unless VGo Communications is enjoined therefrom.

22. Upon information and belief, VGo Communications has derived, received, and will continue to derive and receive gains, profits and advantages from the aforesaid acts of infringement in an amount that is not presently known to InTouch. By reason of the aforesaid infringing acts, InTouch has been damaged, and is entitled to monetary relief in an amount to be proven at trial.

/ / /

/ / /

- 6 -

# IV. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff InTouch prays for judgment and seeks relief as follows:

A.   An Order adjudging VGo Communications to have infringed the '357 and '962 Patents;

B.   A preliminary and permanent injunction pursuant to 35 U.S.C. § 283 enjoining VGo Communications, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with VGo Communications, from infringing the '357 and '962 Patents;

C.   An award of damages for VGo Communications' infringement of the '357 and '962 Patents;

D.   An Order adjudging VGo Communications' infringement of the '357 and '962 Patents to be willful, and that this is an exceptional case under 35 U.S.C. § 285;

E.   A trebling of the award of damages under 35 U.S.C. § 284, or such other enhancement of the award of damages the Court deems appropriate;

F.   An assessment of prejudgment and post-judgment interest and costs against VGo Communications, together with an award of such interest and costs, pursuant to 35 U.S.C. § 284;

G.   An award of attorneys' and non-taxable costs under 35 U.S.C. § 285;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

H.    An award of taxable costs; and

I.    Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  November 4, 2011          By: _____

                                      Craig S. Summers
                                      Joseph S. Cianfrani
                                      Irfan A. Lateef
                                      Brian C. Claassen

                                  Attorneys for Plaintiff
                                      INTOUCH TECHNOLOGIES, INC. D/B/A
                                      INTOUCH HEALTH

- 8 -

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff InTouch Technologies Inc. d/b/a InTouch Health demands a trial by jury of all issues raised by the pleadings which are triable by jury.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  November 4, 2011    By: _____

Craig S. Summers
Joseph S. Cianfrani
Irfan A. Lateef
Brian C. Claassen

Attorneys for Plaintiff
INTOUCH TECHNOLOGIES, INC. D/B/A
INTOUCH HEALTH

12037361

# EXHIBIT 1



US006925357B2

(12) **United States Patent**
Wang et al.

(10) Patent No.: **US 6,925,357 B2**
(45) Date of Patent: **Aug. 2, 2005**

(54) **MEDICAL TELE-ROBOTIC SYSTEM**

(75) Inventors: **Yulun Wang**, Goleta, CA (US); **Keith Phillip Laby**, Santa Barbara, CA (US); **Charles S. Jordan**, Santa Barbara, CA (US); **Steven Edward Butner**, Goleta, CA (US); **Jonathan Southard**, Santa Barbara, CA (US)

(73) Assignee: **InTouch Health, Inc.**, Goleta, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 258 days.

(21) Appl. No.: **10/206,457**

(22) Filed: **Jul. 25, 2002**

(65) **Prior Publication Data**

US 2004/0019406 A1 Jan. 29, 2004

(51) Int. Cl.$^7$ ................................................. G06F 19/00

(52) U.S. Cl. ................... 700/245; 700/246; 700/250; 700/254; 700/260; 700/261; 700/262; 318/568.12; 901/1; 901/2; 702/188

(58) Field of Search ................................. 700/245–246, 700/250, 254, 260–262, 253, 302; 318/568.12, 568.15, 568.11, 568.17, 567; 901/1, 2, 8.1, 8.6; 702/188; 340/870.17, 870.24; 53/501; 701/23, 1, 36; 600/590

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,471,354 A | * | 9/1984 | Smith .................... 340/870.17 |
| 5,341,854 A | * | 8/1994 | Zezulka et al. ................. 141/1 |
| 5,374,879 A | | 12/1994 | Pin et al. |
| 5,762,458 A | * | 6/1998 | Wang et al. .................... 414/1 |
| 5,838,575 A | * | 11/1998 | Lion .................... 700/231 |
| 5,959,423 A | | 9/1999 | Nakanishi et al. |
| 5,966,130 A | | 10/1999 | Benman, Jr. |
| 6,006,946 A | * | 12/1999 | Williams et al. ................. 221/9 |
| 6,036,812 A | * | 3/2000 | Williams et al. ............. 156/277 |

| | | | |
|---|---|---|---|
| 6,259,806 B1 | | 7/2001 | Green |
| 6,292,713 B1 | | 9/2001 | Jouppi et al. |
| 6,346,950 B1 | | 2/2002 | Jouppi |
| 6,369,847 B1 | | 4/2002 | James et al. |
| 6,430,471 B1 | | 8/2002 | Kintou et al. |
| 6,463,361 B1 | | 10/2002 | Wang et al. |
| 6,491,701 B2 | | 12/2002 | Tierney et al. |
| 6,496,099 B2 | | 12/2002 | Wang et al. |
| 6,535,793 B2 | | 3/2003 | Allard |
| 6,549,215 B2 | | 4/2003 | Jouppi |
| 6,804,656 B1 | | 10/2004 | Rosenfeld et al. |
| 2001/0054071 A1 | | 12/2001 | Loeb |
| 2002/0027597 A1 | | 3/2002 | Sachau |
| 2002/0057279 A1 | | 5/2002 | Jouppi |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2289697 A1 | 11/1998 |
| EP | 0981905 B1 | 1/2002 |

OTHER PUBLICATIONS

Kanehiro et al., Virtual humanoid robot platform to develop controllers of real humanoid robot without porting, 2001, IEEE, pp. 1093–1099.*

(Continued)

*Primary Examiner*—Richard M. Camby
*Assistant Examiner*—McDieunel Marc
(74) *Attorney, Agent, or Firm*—Irell & Manella LLP

(57) **ABSTRACT**

A robotic system that includes a remote controlled robot. The robot may include a camera, a monitor and a holonomic platform all attached to a robot housing. The robot may be controlled by a remote control station that also has a camera and a monitor. The remote control station may be linked to a base station that is wirelessly coupled to the robot. The cameras and monitors allow a care giver at the remote location to monitor and care for a patient through the robot. The holonomic platform allows the robot to move about a home or facility to locate and/or follow a patient.

**78 Claims, 11 Drawing Sheets**



Exhibit 1 Page 1 of 24

**US 6,925,357 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0058929 A1 | 5/2002 | Green | |
| 2002/0063726 A1 | 5/2002 | Jouppi | |
| 2002/0120362 A1 | 8/2002 | Lathan et al. | |
| 2002/0130950 A1 | 9/2002 | James et al. | |
| 2002/0141595 A1 | 10/2002 | Jouppi | |
| 2002/0183894 A1 | 12/2002 | Wang et al. | |
| 2003/0050733 A1 | 3/2003 | Wang et al. | |
| 2003/0151658 A1 | 8/2003 | Smith | |
| 2004/0117065 A1 * | 6/2004 | Wang et al. | 700/245 |
| 2004/0143421 A1 * | 7/2004 | Wang et al. | 702/188 |

### OTHER PUBLICATIONS

Lim et al., Control to realize human–like walking of a biped humanoid robot, 2000, IEEE, pp. 3217–3276.*

Paulos et al., "A World Wide Web Telerobotic Remote Environment Browser", http://vive.cs.berkeley.edu/capek, 1995.

Telepresence Research, Inc., "Telepresence Mobile Robot System", http://www.telepresence.com/telepresence–research/TELEROBOT/, Feb. 20, 1995.

Zorn, Benjamin G., "Ubiquitous Telepresence", http://www.cs.colorado.edu/~zorn/ut/vision.html, Mar. 5, 1996.

Paulos, et al., "Ubiquitous Tele–embodiment: Applications and Implications", International Journal of Human Computer Studies, Jun. 1997, vol. 46, No. 6, pp. 861–877.

Paulos, et al., "Designing Personal Tele–Embodiment", Presented at the IEEE International Conference on Robotics and Animation, Leuven, Belgium, May 20, 1998.

Harmo et al., "Moving Eye—Interactive Telepresence Over Internet With a Ball Shaped Mobile Robot", 2000.

Loeb, Gerald, "Virtual Visit: Improving Communication for Those Who Need It Most", 2001.

Paulos, Eric John, "Personal Tele–Embodiment", 2001.

Hees, William P., "Communications Design for a Remote Presence Robot", Jan. 14, 2002.

Jacobs et al., "TeleRehab: Applying Telemedicine to Out-patient Physical Therapy", 2002.

Jouppi, Norman P., "First Steps Towards Mutually–Immersive Mobile Telepresence", 2002.

Eillison et al., "Telerounding and Patient Satisfaction Following Surgery".

Celi, et al., "The eICU: It's not just telemedicine", Critical Care Medicine, vol. 29, No. 8 (Supplement), Aug. 2001.

Jouppi, et al., "Mutually–Immersive Audio Telepresence", Audio Engineering Society Convention Paper, presented at 113th Convention Oct. 2002.

Bauer, Jeffrey C., "Service Robots in Health Care: The Evolution of Mechanical Solutions to Human Resource Problems", Jun. 2003.

* cited by examiner

**Exhibit 1 Page 2 of 24**



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

Exhibit 1 Page 8 of 24



*FIG. 7*

- 18 -

Exhibit 1 Page 9 of 24



FIG. 8

Exhibit 1 Page 10 of 24



*FIG. 9*

FIG. 10



FIG. 11

US 6,925,357 B2

1

**MEDICAL TELE-ROBOTIC SYSTEM**

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The subject matter disclosed generally relates to the field of robotics used in the medical field.

2. Background Information

There is a growing need to provide remote health care to patients that have a variety of ailments ranging from Alzheimers to stress disorders. To minimize costs it is desirable to provide home care for such patients. Home care typically requires a periodic visit by a health care provider such as a nurse or some type of assistant. Due to financial and/or staffing issues the health care provider may not be there when the patient needs some type of assistance. Additionally, existing staff must be continuously trained, which can create a burden on training personnel. It would be desirable to provide a system that would allow a health care provider to remotely care for a patient without being physically present.

Robots have been used in a variety of applications ranging from remote control of hazardous material to assisting in the performance of surgery. For example, U.S. Pat. No. 5,762, 458 issued to Wang et al. discloses a system that allows a surgeon to perform minimally invasive medical procedures through the use of robotically controlled instruments. There have also been developed "toy" robots for home use. Such robots typically have a relatively simple movement platform and some type of speech synthesis for generating words and sounds. It would be desirable to provide a robotic system that would allow for remote patient monitoring and assistance.

### BRIEF SUMMARY OF THE INVENTION

A robot that may include a camera and a monitor that are attached to a housing. The robot may also have a platform that is attached to the housing and coupled to a controller. The controller may be coupled to a broadband interface.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an illustration of a robotic system;

FIG. 2 is a schematic of an electrical system of a robot;

FIG. 3 is a further schematic of the electrical system of the robot;

FIG. 4 is an illustration of a robot with an arm in an upward position;

FIG. 5 is an illustration of the robot with the arm in a lower position;

FIG. 6 is an illustration of a holonomic platform of the robot;

FIG. 7 is an illustration of a roller assembly of the holonomic platform;

FIG. 8 is an illustration of an arm assembly of the robot;

FIG. 9 is an illustration of a gripper assembly of the arm;

FIG. 10 is a schematic of a battery recharger for the robot;

FIG. 11 is a vector diagram that may be used to compute movement of the robot.

### DETAILED DESCRIPTION

Disclosed is a robotic system that includes a remote controlled robot. The robot may include a camera, a monitor and a holonomic platform all attached to a robot housing.

2

The robot may be controlled by a remote control station that also has a camera and a monitor. The remote control station may be linked to a base station that is wirelessly coupled to the robot. The cameras and monitors allow a care giver at the remote location to monitor and care for a patient through the robot. The holonomic platform allows the robot to move about a home or facility to locate and/or follow a patient.

Referring to the drawings more particularly by reference numbers, FIG. 1 shows a robotic system 10. The robotic system 10 includes a robot 12, a base station 14 and a remote control station 16. The remote control station 16 may be coupled to the base station 14 through a network 18. By way of example, the network 18 may be either a packet switched network such as the Internet, or a circuit switched network such has a Public Switched Telephone Network (PSTN) or other broadband system. The base station 14 may be coupled to the network 18 by a modem 20 or other broadband network interface device.

The remote control station 16 may include a computer 22 that has a monitor 24, a camera 26, a microphone 28 and a speaker 30. The computer 22 may also contain an input device 32 such as a joystick or a mouse. The control station 16 is typically located in a place that is remote from the robot 12. Although only one remote control station 16 is shown, the system 10 may include a plurality of remote stations. Additionally, although only one robot 12 is shown, it is to be understood that the system 10 may have a plurality of robots 12. In general any number of robots 12 may be controlled by any number of remote stations. For example, one remote station 16 may be coupled to a plurality of robots 12, or one robot 12 may be coupled to a plurality of remote stations 16.

The robot 12 includes a movement platform 34 that is attached to a robot housing 36. Also attached to the robot housing 36 are a camera 38, a monitor 40, a microphone(s) 42 and a speaker 44. The microphone 42 and speaker 30 may create a stereophonic sound. The robot 12 may also have an antennae 45 that is wirelessly coupled to an antennae 46 of the base station 14. The system 10 allows a user at the remote control station 16 to move the robot 12 through the input device 32. The robot camera 38 is coupled to the remote monitor 24 so that a user at the remote station 16 can view a patient. Likewise, the robot monitor 40 is coupled to the remote camera 26 so that the patient can view the user. The microphones 28 and 42, and speakers 30 and 44, allow for audible communication between the patient and the user.

The remote station computer 22 may operate Microsoft OS software and WINDOWS XP or other operating systems such as LINUX. The remote computer 22 may also operate a video driver, a camera driver, an audio driver and a joystick driver. The video images may be transmitted and received with compression software such as MPEG CODEC.

FIGS. 2 and 3 show an embodiment of the robot 12. The robot 12 may include a high level control system 50 and a low level control system 52. The high level control system 50 may include a processor 54 that is connected to a bus 56. The bus is coupled to the camera 38 by an input/output (I/O) port 58, and to the monitor 40 by a serial output port 60 and a VGA driver 62. The monitor 40 may include a touchscreen function that allows the patient to enter input by touching the monitor screen.

The speaker 44 is coupled to the bus 56 by a digital to analog converter 64. The microphone 42 is coupled to the bus 56 by an analog to digital converter 66. The high level controller 50 may also contain random access memory (RAM) device 68, a non-volatile RAM device 70 and a mass storage device 72 that are all coupled to the bus 62. The mass

**Exhibit 1 Page 14 of 24**

US 6,925,357 B2

3

storage device 72 may contain medical files of the patient that can be accessed by the user at the remote control station 16. For example, the mass storage device 72 may contain a picture of the patient. The user, particularly a health care provider, can recall the old picture and make a side by side comparison on the monitor 24 with a present video image of the patient provided by the camera 38. The robot antennae 44 may be coupled to a wireless transceiver 74. By way of example, the transceiver 74 may transmit and receive information in accordance with IEEE 802.11a.

The controller 54 may operate with a LINUX OS operating system. The controller 54 may also operate X WINDOWS along with video, camera and audio drivers for communication with the remote control station 16. Video information may be transceived using MPEG CODEC compression techniques. The software may allow the user to send e-mail to the patient and vice versa, or allow the patient to access the Internet. In general the high level controller 50 operates to control the communication between the robot 12 and the remote control station 16.

The high level controller 50 may be linked to the low level controller 52 by serial ports 76 and 78. The low level controller 52 includes a processor 80 that is coupled to a RAM device 82 and non-volatile RAM device 84 by a bus 86. The robot 12 contains a plurality of motors 88 and motor encoders 90. The encoders 90 provide feedback information regarding the output of the motors 88. The motors 88 can be coupled to the bus 86 by a digital to analog converter 92 and a driver amplifier 94. The encoders 90 can be coupled to the bus 86 by a decoder 96. The robot 12 also has a number of proximity sensors 98 (see also FIG. 1). The position sensors 98 can be coupled to the bus 86 by a signal conditioning circuit 100 and an analog to digital converter 102.

The low level controller 52 runs software routines that mechanically actuate the robot 12. For example, the low level controller 52 provides instructions to actuate the movement platform to move the robot 12, or to actuate an arm of the robot. The low level controller 52 may receive movement instructions from the high level controller 50. The movement instructions may be received as movement commands from the remote control station. Although two controllers are shown, it is to be understood that the robot 12 may have one controller controlling the high and low level functions.

The various electrical devices of the robot 12 may be powered by a battery(ies) 104. The battery 104 may be recharged by a battery recharger station 106 (see also FIG. 1). The low level controller 52 may include a battery control circuit 108 that senses the power level of the battery 104. The low level controller 52 can sense when the power falls below a threshold and then send a message to the high level controller 50. The high level controller 50 may include a power management software routine that causes the robot 12 to move so that the battery 104 is coupled to the recharger 106 when the battery power falls below a threshold value. Alternatively, the user can direct the robot 12 to the battery recharger 106. Additionally, the battery may be replaced or the robot 12 may be coupled to a wall power outlet by an electrical cord (not shown).

FIG. 4 shows an embodiment of the robot 12. The robot 12 may include a holonomic platform 110 that is attached to a robot housing 112. The holonomic platform 110 allows the robot 12 to move in any direction. Although not shown the robot housing 112 may include bumpers.

The robot 12 may have an arm 114 that supports the camera 38 and monitor 40. The arm 114 may have two

4

degrees of freedom so that the camera 26 and monitor 24 can be moved from an upper position shown in FIG. 4 to a lower position shown in FIG. 5. The arm 114 may have an end effector 116 such as a gripper that can grasp objects.

The robot 12 may include a drawer 118 that can automatically move between a closed position and an open position. The drawer 118 can be used to dispense drugs to a patient. For example, the drawer 118 may include a drug(s) that must be taken at a certain time. The robot 12 may be programmed so that the drawer 118 is opened at the desired time. A nurse or other health care provider may periodically "load" the drawer 118. The robot may also have a battery recharger port 119. Although drugs are described, it is to be understood that the drawer 118 could hold any item.

As shown in FIG. 6 the holonomic platform 110 may include three roller assemblies 120 that are mounted to a base plate 122. The roller assemblies 120 are typically equally spaced about the platform 110 and allow for movement in any direction.

FIG. 7 shows an embodiment of a roller assembly 120. Each assembly 120 may include a drive ball 124 that is driven by a pair of transmission rollers 126. The assembly 120 includes a retainer ring 128 and a plurality of bushings 130 that allow the ball 124 to rotate in an x and y direction but prevents movement in a z direction.

The transmission rollers 126 are coupled to a motor assembly 132. The assembly 132 corresponds to the motor 88 shown in FIG. 3. The motor assembly 132 includes an output pulley 134 attached to a motor 136. The output pulley 134 is coupled to a pair of ball pulleys 138 by a drive belt 140. The ball pulleys 138 are attached to drive pins 142 that are attached to a transmission bracket 144. The transmission rollers 126 are attached to a transmission bracket 144 by a roller pin 146. The transmission brackets 144 each have a pin 143 that is supported by a part of the housing.

Rotation of the output pulley 134 rotates the ball pulleys 138. Rotation of the ball pulleys 138 causes the transmission rollers 126 to rotate and spin the ball 124 through frictional forces. Spinning the ball 124 will move the robot 12. The drive balls 126 are out of phase so that one of the balls 126 is always in contact with ball 124. The roller pin 146 and bracket 144 allow the transmission rollers 126 to freely spin and allow orthoganal directional passive movement when one of the other roller assemblies 120 is driving and moving the robot 12.

FIGS. 8 and 9 show an embodiment of the arm 114. The arm 114 may include a first linkage 150 that is pivotally mounted to a fixed plate 152 of the robot housing 12. The arm 114 may also include a second linkage 154 that is pivotally connected to the first linkage 150 and a third linkage 156 that is pivotally connected to the second linkage 154.

The first linkage 150 may be coupled to a first motor 158 and motor encoder 160 by a gear assembly 162. Rotation of the motor 158 will cause a corresponding pivotal movement of the linkage 150 and arm 114. The linkage 150 may be coupled to the fixed plate 152 by a bearing 164.

The second linkage 154 may be coupled to a second motor 166 and encoder 168 by a gear assembly 170 and a pulley assembly 172. The pulley assembly 172 may be connected to the gear assembly 170 by a pin 174 that extends through the gear assembly 162 of the first motor 158. The second linkage 154 may be attached to a pin 176 that can spin relative to the first linkage 150. The pulley assembly 172 may have a belt 178 that couples a pair of pulleys 180 and 182 that are attached to pins 174 and 176, respectively. Pin

Exhibit 1 Page 15 of 24

US 6,925,357 B2

5

176 may be coupled to the first linkage 150 by bearings 182. The arm 114 is configured to allow wires 183 to be internally routed through the linkages 150, 154 and 156.

The third linkage 156 may be connected to a pin 184 that can spin relative to the second linkage 154. The pin 184 may be coupled to the second linkage 154 by a bearing assembly 186. The third linkage 156 may be structurally coupled to the first linkage 150 by a pair of pulley assemblies 188. The pulley assembly 188 insures a horizontal position of the third linkage 156 no matter what position the first 150 and second 154 linkages are in. As shown in FIGS. 4 and 5 the third linkage 156 is always in a horizontal position. This insures that the camera 26 is always in the same orientation, thus reducing the possibility of disorientation at the remote control station when viewing the patient.

The gripper 116 is attached to the third linkage 156. The gripper 116 may include a pair of fingers 190 that are pivotally attached to a base plate 192. The fingers 190 are coupled to a motor 194 and encoder 196 by a gear assembly 198. The base plate 192 is coupled to the third linkage 156 by a bearing assembly 200. The motor 194 can spin the base plate 192 and fingers 192 relative to the third linkage 156.

The gripper 116 may further have a push rod 202 that can engage cam surfaces 204 of the fingers 190 to move the gripper fingers 190 between open and closed positions. The push rod 202 may be coupled to a motor 206 and encoder (not shown) by a linkage assembly 208. Actuation of the motor 206 will translate the push rod 202 and move the fingers 190. The motor 206 may have a force sensor that provides force feedback back to the remote control station. The input device of the remote control station may have a force feedback mechanism so that the user feels the force being exerted onto the gripper fingers 190.

In operation, the robot 12 may be placed in a home or a facility where one or more patients are to be monitored and/or assisted. The facility may be a hospital or a residential care facility. By way of example, the robot 12 may be placed in a home where a health care provider may monitor and/or assist the patient. Likewise, a friend or family member may communicate with the patient. The cameras and monitors at both the robot and remote control station allow for teleconferencing between the patient and the person at the remote station.

The robot 12 can be maneuvered through the home or facility by manipulating the input device 32 at the remote station 16. The robot 12 may also have autonomous movement. For example, the robot 12 may be programmed to automatically move to a patients room at a certain time to dispense drugs in the drawer 118 without input from the remote station 16. The robot 12 can be programmed to monitor and/or assist a patient 24 hours a day, 7 days a week. Such a monitoring capability is enhanced by the autonomous recharging function of the robot.

The robot 10 may be controlled by a number of different users. To accommodate for this the robot may have an arbitration system. The arbitration system may be integrated into the operating system of the robot 12. For example, the arbitration technique may be embedded into the operating system of the high-level controller 50.

By way of example, the, users may be divided into classes that include the robot itself, a local user, a caregiver, a doctor, a family member, or a service provider. The robot may override input commands that conflict with robot operation. For example, if the robot runs into a wall, the system may ignore all additional commands to continue in the direction of the wall. A local user is a person who is

6

physically present with the robot. The robot could have an input device that allows local operation. For example, the robot may incorporate a voice recognition system that receives and interprets audible commands.

A caregiver is someone who remotely monitors the patient. A doctor is a medical professional who can remotely control the robot and also access medical files contained in the robot memory. The family and service users remotely access the robot. The service user may service the system such as by upgrading software, or setting operational parameters.

Message packets may be transmitted between a robot 12 and a remote station 16. The packets provide commands and feedback. Each packet may have multiple fields. By way of example, a packet may include an ID field a forward speed field, an angular speed field, a stop field, a bumper field, a sensor range field, a configuration field, a text field and a debug field.

The identification of remote users can be set in an ID field of the information that is transmitted from the remote control station 16 to the robot 12. For example, a user may enter a user ID into a setup table in the application software run by the remote control station 16. The user ID is then sent with each message transmitted to the robot.

The robot 12 may operate in one of two different modes; an exclusive mode, or a sharing mode. In the exclusive mode only one user has access control of the robot. The exclusive mode may have a priority assigned to each type of user. By way of example, the priority may be in order of local, doctor, caregiver, family and then service user. In the sharing mode two or more users may share access with the robot. For example, a caregiver may have access to the robot, the caregiver may then enter the sharing mode to allow a doctor to also access the robot. Both the caregiver and the doctor can conduct a simultaneous tele-conference with the patient.

The arbitration scheme may have one of four mechanisms; notification, timeouts, queue and call back. The notification mechanism may inform either a present user or a requesting user that another user has, or wants, access to the robot. The timeout mechanism gives certain types of users a prescribed amount of time to finish access to the robot. The queue mechanism is an orderly waiting list for access to the robot. The call back mechanism informs a user that the robot can be accessed. By way of example, a family user may receive an e-mail message that the robot is free for usage. Tables 1 and 2, show how the mechanisms resolve access request from the various users.

TABLE I

| User | Access Control | Medical Record | Command Override | Software/ Debug Access | Set Priority |
|---|---|---|---|---|---|
| Robot | No | No | Yes (1) | No | No |
| Local | No | No | Yes (2) | No | No |
| Caregiver | Yes | Yes | Yes (3) | No | No |
| Doctor | No | Yes | No | No | No |
| Family | No | No | No | No | No |
| Service | Yes | No | Yes | Yes | Yes |

**Exhibit 1 Page 16 of 24**

US 6,925,357 B2

7         8

### TABLE II

| | | Requesting User | | | | |
|---|---|---|---|---|---|---|
| | | Local | Caregiver | Doctor | Family | Service |
| Current User | Local | Not Allowed | Warn current user of pending user Notify requesting user that system is in use Set timeout | Warn current user of pending user Notify requesting user that system is in use Set timeout = 5 m | Warn current user of pending user Notify requesting user that system is in use Set timeout = 5 m Call back | Warn current user of pending user Notify requesting user that system is in use No timeout Call back |
| | Caregiver | Warn current user of pending user Notify requesting user that system is in use. Release control | Not Allowed | Warn current user of pending user Notify requesting user that system is in use Set timeout = 5 m Queue or callback | Warn current user of pending user Notify requesting user that system is in use Set timeout = 5 m | Warn current user of pending user Notify requesting user that system is in use No timeout Callback |
| | Doctor | Warn current user of pending user Notify requesting user that system is in use Release control | Warn current user of pending user Notify requesting user that system is in use Set timeout = 5 m | Warn current user of pending user Notify requesting user that system is in use No timeout Callback | Notify requesting user that system is in use No timeout Queue or callback | Warn current user of pending user Notify requesting user that system is in use No timeout Callback |
| | Family | Warn current user of pending user Notify requesting user that system is in use Release Control | Notify requesting user that system is in use No timeout Put in queue or callback | Warn current user of pending user Notify requesting user that system is in use Set timeout = 1 m | Warn current user of pending user Notify requesting user that system is in use Set timeout = 5 m Queue or callback | Warn current user of pending user Notify requesting user that system is in use No timeout Callback |
| | Service | Warn current user of pending user Notify requesting user that system is in use No timeout | Notify requesting user that system is in use No timeout Callback | Warn current user of request Notify requesting user that system is in use No timeout Callback | Warn current user of pending user Notify requesting user that system is in use No timeout Queue or callback | Not Allowed |

35

The information transmitted between the station 16 and the robot 12 may be encrypted. Additionally, the user may have to enter a password to enter the system 10. A selected robot is then given an electronic key by the station 16. The robot 12 validates the key and returns another key to the station 16. The keys are used to encrypt information transmitted in the session.

FIG. 10 shows an embodiment of a battery recharger. The robot port 119 may include a secondary winding 250 that is magnetically coupled to a primary winding 252 of the battery recharger station 106. The primary winding 252 is coupled to an electrical outlet plug 254 by a relay circuit 256, a fuse 258 and a switch 260. The relay 256 is controlled by a recharger controller 262.

The recharger controller 262 is connected to a recharger infrared (IR) transceiver 264. The recharger IR transceiver 264 is coupled to a robot IR transceiver 266. The robot IR transceiver 266 is connected to the low level controller 52. The robot 10 may also have an alignment sensor 268 that can sense a target 270 on the station 106. By way of example, the sensor 268 may include an optical emitter and receiver that detects a light beam reflected from the target 270. The controller 52 may also sense a current flow into the battery 104 to determine whether the robot 12 is aligned with the docking station 106.

The secondary windings 250 are connected to the battery 104 by a charger circuit 272. The secondary 250 and primary 252 windings may each have wires 274 wrapped about a magnetic core 276. The station 106 may also have an oscillator/chopper circuit (not shown) to increase the voltage magnetically transferred to the secondary winding 250.

In operation, the robot 10 is moved to the battery recharger station 106 either autonomously, or by user control. The robot 10 is moved until the sensor 268 is aligned with the target 270. The low level controller 52 then sends a command to the recharger controller 262 through the transceivers 264 and 266. The recharger controller 262 then closes the relay 256 wherein power is transferred to the battery 104 through the windings 250 and 252. When the battery 104 is recharged, or the battery recharging process is interrupted by the user, the low level controller 52 transmits a command to the recharger controller 262 to open the relay 256. The robot 10 then moves away from the recharging station 106.

FIG. 11 shows a vector diagram that can be used to compute movement of the robot with the following equations:

$$w_1 = \frac{|V|}{R_1}(\mathrm{Sin}\,\alpha_1\,\mathrm{Sin}\theta - \mathrm{Cos}\,\alpha_1\,\mathrm{Cos}\theta) + \frac{\Psi L_1}{R_1} \qquad (1)$$

$$w_2 = \frac{|V|}{R_2}\mathrm{Sin}\theta + \frac{\Psi L_2}{R_2} \qquad (2)$$

$$w_3 = \frac{|V|}{R_3}(\mathrm{Sin}\,\alpha_3\,\mathrm{Sin}\theta + \mathrm{Cos}\,\alpha_3\,\mathrm{Cos}\theta) + \frac{\Psi L_3}{R_3} \qquad (3)$$

where,

$w_1$=is the drive angular velocity of a first ball 124.

$w_2$=is the drive angular velocity of a second ball 124.

$W_3$=is the drive angular velocity of a third ball 124.

- 26 -

**Exhibit 1 Page 17 of 24**

US 6,925,357 B2

9

V=is the input linear velocity for the robot. V has components $V_x$ and $V_y$, where; $V_x=|V|\cos\theta$ and $V_y=|V|\sin\theta$.

$\psi$=is the input angular velocity for the robot.

Let the angular velocity vector

$$w=[w_1, w_2, w_3]^T. \qquad (4)$$

$$A = \begin{bmatrix} -\dfrac{Cos\,\alpha_1}{R_1} & \dfrac{Sin\,\alpha_1}{R_1} & \dfrac{L_1}{R_1} \\[2mm] O & -\dfrac{1}{R_2} & \dfrac{L_2}{R_2} \\[2mm] \dfrac{Cos\,\alpha_3}{R_3} & \dfrac{Sin\,\alpha_3}{R_3} & \dfrac{L_3}{R_3} \end{bmatrix} \qquad (5)$$

and the velocity vector:

$$V=[vx, vy, \psi]^T \qquad (6)$$

$$W=A\cdot V \qquad (7)$$

The angular velocity vector w is calculated from equation (7) and compared with the actual w valves measured by the motor encoder. An algorithm performs an error correction routine to compensate for differences in the actual and desired valves.

While certain exemplary embodiments have been described and shown in the accompanying drawings, it is to be understood that such embodiments are merely illustrative of and not restrictive on the broad invention, and that this invention not be limited to the specific constructions and arrangements shown and described, since various other modifications may occur to those ordinarily skilled in the art.

What is claimed is:

1. A method for remotely operating a robot to monitor a patient, comprising:

transmitting a first command to move a mobile robot from a first remote control station;

transmitting a second command to move the mobile robot from a second remote control station;

determining which command has priority; and,

moving the mobile robot in response to the transmitted command with priority.

2. The method of claim 1, further comprising transmitting a video image from the mobile robot to the remote control station.

3. The method of claim 2, wherein an existing video image and a pre-existing video image is transmitted to the remote control station from the mobile robot.

4. The method of claim 1, further comprising transmitting a video image from the remote control station to the mobile robot.

5. The method of claim 1, further comprising moving a drawer of the mobile robot to an open position to dispense a drug.

6. The method of claim 1, wherein the robot autonomously moves to a battery recharger station.

7. A robot, comprising:

a housing;

a movement platform attached to said housing;

a camera attached to said housing;

a mass storage device that stores a pre-existing video image of a patient; and,

a controller coupled to said movement platform.

8. The robot of claim 7, further comprising an arm coupled to said housing.

10

9. The robot of claim 8, wherein said arm includes a gripper.

10. The robot of claim 7, further comprising a speaker coupled to said housing.

11. The robot of claim 7, further comprising a microphone coupled to said housing.

12. The robot of claim 7, further comprising a wireless transceiver coupled to said housing.

13. The robot of claim 7, further comprising a battery recharger station, a battery that is coupled to said housing and can be coupled to said battery recharger station, and a power management software routine wherein said holonomic platform moves said housing so that said battery is coupled to said battery recharger station.

14. The robot of claim 7, wherein said movement platform includes a plurality of roller assemblies.

15. The robot of claim 7, wherein said controller runs a routine to moves a drawer of said housing to an open position.

16. A method for monitoring a patient, comprising:

storing a pre-existing video image of a patient;

capturing an existing video image of the patient; and,

transmitting the pre-existing video image and the existing video image to a remote control station.

17. The method of claim 16, wherein the robot is remotely controlled.

18. A robot system, comprising:

a battery recharger station;

a robot housing;

a battery coupled to said robot housing;

a movement platform attached to said robot housing;

a camera attached to said robot housing; and,

a controller that is attached to said robot housing and coupled to said movement platform, said controller operates a power management software routine that causes said movement platform to move said robot housing so that said battery is coupled to said battery recharger.

19. The robot system of claim 18, further comprising an arm coupled to said robot housing.

20. The robot system of claim 19, wherein said arm includes a gripper.

21. The robot system of claim 18, further comprising a speaker coupled to said robot housing.

22. The robot system of claim 18, further comprising a microphone coupled to said robot housing.

23. The robot system of claim 18, further comprising a wireless transceiver coupled to said robot housing.

24. The robot system of claim 18, wherein said movement platform includes a plurality of roller assemblies.

25. The robot system of claim 18, further comprising a mass storage device that stores a video image.

26. A method for operating a robot, comprising:

operating a software routine within a robot to determine whether the robot needs power; and,

moving the robot to a battery recharger station when the robot needs power.

27. The method of claim 26, wherein the robot is remotely controlled.

28. A system for remotely visiting a person located in a healthcare facility, comprising:

a broadband network;

a remote station that is coupled to said broadband network, said remote station includes a monitor, a speaker and an input device to generate a robot command; and,

US 6,925,357 B2

11

12

a robot that is coupled to said remote station through said broadband network, said robot having a camera that captures video of a person that is transmitted to said remote station and a microphone that captures audio from the person that is transmitted to said remote station, said robot moves across a surface of the health-care facility in response to receiving said robot command from said remote station.

29. The system of claim 28, wherein said remote station includes a camera and a microphone and said robot includes a monitor and a speaker.

30. The system of claim 28, wherein said robot includes a holonomic platform.

31. The system of claim 28, wherein said robot includes a wireless transceiver.

32. The system of claim 28, wherein said remote station includes a computer.

33. The system of claim 28, wherein said remote station is assigned a family priority.

34. The system of claim 28, wherein said input device is a joystick.

35. The system of claim 28, wherein said broadband network is a packet switched network.

36. The system of claim 28, wherein said robot is located in a hospital.

37. The system of claim 28, wherein said robot is located in a residential care facility.

38. A system for remotely visiting a person located in a healthcare facility, comprising:

broadband network means for transmitting information;

remote station means for receiving video and audio transmitted through said broadband network means and generating a robot command that is transmitted through said broadband network means; and,

robot means for capturing video and audio of a person that is transmitted to said remote station means through said broadband network means, and moving across a surface of the healthcare facility in response to receiving said robot command from said remote station means through said broadband network means.

39. The system of claim 38, wherein said remote station means transmits video and audio to said robot means through said broadband network means.

40. The system of claim 38, wherein said robot means includes a holonomic platform.

41. The system of claim 38, wherein said robot means includes a wireless transceiver.

42. The system of claim 38, wherein said remote station means includes a computer.

43. The system of claim 38, wherein said remote station means is assigned a family priority.

44. The system of claim 38, wherein said remote station means includes a joystick to generate said robot command.

45. The system of claim 38, wherein said robot means is located in a hospital.

46. The system of claim 38, wherein said robot means is located in a residential care facility.

47. A robot system, comprising:

a mobile robot that has a camera and a monitor;

a first remote station that can access said mobile robot;

a second remote station that can access said mobile robot; and,

an arbitrator that can control access to said mobile robot by said first and second remote stations.

48. The system of claim 47, wherein said arbitrator includes a notification mechanism.

49. The system of claim 47, wherein said arbitrator includes a timeout mechanism.

50. The system of claim 47, wherein said arbitrator includes a queue mechanism.

51. The system of claim 47, wherein said arbitrator includes a call back mechanism.

52. The system of claim 47, wherein said first and second remote stations each have a priority and said arbitrator provides robot access to said remote station with a highest priority.

53. The system of claim 52, wherein said first and second remote stations may be given priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

54. The system of claim 47, wherein said arbitrator is located within said robot.

55. A robot system, comprising:

a mobile robot that has a camera and a monitor;

a first remote station that can access said mobile robot;

a second remote station that can access said mobile robot; and,

arbitration means for controlling access to said mobile robot by said first and second remote stations.

56. The system of claim 55, wherein said arbitrator means includes notification means for notifying said first remote station that said second remote station is requesting access to said mobile robot.

57. The system of claim 55, wherein said arbitrator means includes timeout means that creates a time interval in which one of said remote stations must relinquish access to said mobile robot.

58. The system of claim 55, wherein said arbitrator means includes queue means for establishing a waiting list of remote stations seeking access to said mobile robot.

59. The system of claim 55, wherein said arbitrator means includes call back means for providing a message to one of said remote stations that said mobile robot can be accessed.

60. The system of claim 55, wherein said first and second remote stations each have a priority and said arbitrator means provides robot access to said remote station with a highest priority.

61. The system of claim 60, wherein said first and second remote stations may be given priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

62. The system of claim 55, wherein said arbitrator means is located within said robot.

63. A robot system, comprising:

a broadband network;

a mobile robot that is coupled to said broadband network, and has a camera and a monitor;

a first remote station that can access said mobile robot through said broadband network;

a second remote station that can access said mobile robot through said broadband network; and,

an arbitrator that can control access to said mobile robot by said first and second remote stations.

64. The system of claim 63, wherein said arbitrator includes a notification mechanism.

65. The system of claim 63, wherein said arbitrator includes a timeout mechanism.

66. The system of claim 63, wherein said arbitrator includes a queue mechanism.

67. The system of claim 63, wherein said arbitrator includes a call back mechanism.

68. The system of claim 63, wherein said first and second remote stations each have a priority and said arbitrator provides robot access to said remote station with a highest priority.

Exhibit 1 Page 19 of 24

US 6,925,357 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

69. The system of claim **68**, wherein said first and second remote stations may be given priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

70. The system of claim **63**, wherein said arbitrator is located within said robot.

71. A robot system, comprising:

a broadband network;

a mobile robot that is coupled to said broadband network, and has a camera and a monitor;

a first remote station that can access said mobile robot through said broadband network;

a second remote station that can access said mobile robot through said broadband network; and,

arbitration means for controlling access to said robot by said first and second remote stations.

72. The system of claim **71**, wherein said arbitrator means includes notification means for notifying said first remote station that said second remote station is requesting access to said mobile robot.

73. The system of claim **71**, wherein said arbitrator means includes timeout means that creates a time interval in which one of said remote stations must relinquish access to said mobile robot.

74. The system of claim **71**, wherein said arbitrator means includes queue means for establishing waiting list of remote stations seeking access to said mobile robot.

75. The system of claim **71**, wherein said arbitrator means includes call back means for providing a message to one of said remote stations that said mobile robot can be accessed.

76. The system of claim **71**, wherein said first and second remote stations each have a priority and said arbitrator means provides robot access to said remote station with a highest priority.

77. The system of claim **76**, wherein said first and second remote stations may be given priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

78. The system of claim **71**, wherein said arbitrator means is located within said robot.

*   *   *   *   *

US006925357C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (7501st)

# United States Patent
Wang et al.

(10) **Number:** US 6,925,357 C1

(45) **Certificate Issued:** May 11, 2010

(54) **MEDICAL TELE-ROBOTIC SYSTEM**

(75) Inventors: **Yulun Wang**, Goleta, CA (US); **Keith Phillip Laby**, Santa Barbara, CA (US); **Charles S. Jordan**, Santa Barbara, CA (US); **Steven Edward Butner**, Goleta, CA (US); **Jonathan Southard**, Santa Barbara, CA (US)

(73) Assignee: **Intouch Technologies, Inc.**, Goleta, CA (US)

**Reexamination Request:**
No. 90/009,291, Sep. 30, 2008

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 6,925,357 |
| Issued: | Aug. 2, 2005 |
| Appl. No.: | 10/206,457 |
| Filed: | Jul. 25, 2002 |

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 11/00* | (2006.01) |
| *G06F 19/00* | (2006.01) |
| *G06F 15/00* | (2006.01) |
| *B25J 5/00* | (2006.01) |
| *B25J 9/00* | (2006.01) |

(52) **U.S. Cl.** .............. **700/245**; 318/568.12; 348/E7.088; 700/246; 700/250; 700/254; 700/260; 700/261; 700/262; 702/188; 901/1; 901/2

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,170,929 B1 | 1/2001 | Wilson et al. |
| 6,292,713 B1 | 9/2001 | Jouppi et al. |
| 6,852,107 B2 | 2/2005 | Wang et al. |
| 6,914,622 B1 | 7/2005 | Smith et al. |
| 2001/0010053 A1 | 7/2001 | Ben-Shachar et al. |

OTHER PUBLICATIONS

Baltus, *Towards Personal Service Robot for the Elderly*, Proceedings of the for the Elderly Workshop on Interactive Robots and Entertainment, 2000 http://www.cs.cmu.edu/~thrun/papers/thrun.nursebot-early.pdf.

Chen, *Collaborative Teleoperation via the Internet*, IEEE International Conference on Robotics and Automation, Apr. 2000, http://citeseer.ist.psu.edu/cache/papers/cs/14458/http:zSzzSzwww.ieor.berkeley.eduzSz~goldbergzSzpubsz-Szouija.pdf/goldberg00collaborative.pdf.

Dalton, *Techniques for Web Telerobatics*, PhD thesis, University of Western Australia, 2001, http://telerobot.mech.uwa.edu.au/information.html, http://catalogue.library.uwa.edu.au/search~/t?SEARCH=techniues+for+web+telerobotics&searchscope=1.

Fiorini, *Health Care Robotics: A Progress Report*, IEEE Interntional Conference on Robotics and Automation, 1997.

Goldberg, *Desktop Teleoperation via the World Wide Web*, Proceedings of the IEEE International Conference on Robotics and Automation, 1995, http://citeseer.ist.psu.edu/cache/papers/cs/5/ftp:zSzzSzusc.eduzSzpubzSziriszSzraiders.pdf/goldberg95desktop.pdf.

ITU, *ITU-TH.323 Packet-based multimedia communications*, ITU, Feb. 1998, http://www.itu.int/rec/T-REC-H.323-199802-S/cn.

(Continued)

*Primary Examiner*—Peter C. English

(57) **ABSTRACT**

A robotic system that includes a remote controlled robot. The robot may include a camera, a monitor and a holonomic platform all attached to a robot housing. The robot may be controlled by a remote control station that also has a camera and a monitor. The remote control station may be linked to a base station that is wirelessly coupled to the robot. The cameras and monitors allow a care giver at the remote location to monitor and care for a patient through the robot. The holonomic platform allows the robot to move about a home or facility to locate and/or follow a patient.



- 30 -

Exhibit 1 Page 21 of 24

**US 6,925,357 C1**

Page 2

OTHER PUBLICATIONS

Long, *HelpMate Robotics, Inc. (Formerly Transitions Research Corporation) Robot Navigation Technology*, NIST Special Publication 950–1, Mar. 1999, http://www.atp.nist.gov/eao/sp950–1/helpmate.htm.

Holmberg, *Development of a Holonomic Mobile Robot for Mobile Manipulation Tasks*, International Conference on Field and Service Robotics, Pittsburgh, PA, Aug. 1999, http://ai.stanford.edu/~rah/papers/FSR99.pdf.

Meng, *E–Service Robot in Home Healthcare*, Proceedings of the 2000 IEEE/RSJ International Conference on Intelligent Robots and Systems, 2000.

Michaud, *Introducing 'Nursebot'*, The Boston Globe, Sep. 11, 2001 p. F5 , The Boston Globe, Sep. 11, 2001, http://www.cs.cmu.edu/~nursebot/web/press/globe_3_01/index.html.

Oh, *Autonomous Battery Recharging for Indoor Mobile Robots*, Proceedings of Australian Conference on Robotics and Automation, 2000, http://users.rsise.anu.edu.au/~rsl/rsl_papers/ACRA2000/Auto_Recharge_Paper.pdf.

Paulos, *Personal Tele–Embodiment*, PhD Dissertation, UC Berkeley, 2001, http://www.paulos.net/papers/dissertation/Eric%20Paulos%20PhD%20Dissertation.pdf.

Paulos, PRoP: *Personal Roving Presence*, ACM:CHI Proceedings of CHI '98, http://www.prop.org/papers/chi98.pdf.

Hanebeck, Roman: *A Mobile Robotic Assistant for Indoor Service Applications*, Proceedings of the 1997 IEEER/RSJ International Conference on Intelligent Robots and Systems, 1997.

Schulz, *Web Interfaces for Mobile Robots in Public Places*, Robotics & Automation Magazine, IEEE vol. 7, Issue 1, Mar. 2000, http://citeseer.ist.psu.edu/cache/papers/cs/32860/http:zSzzSzwww.informatik.uni–freiburg.dezSz~burgardzSzabstractszSz.zSzpostscriptszSzweb–ram–00.pdf/schulz99web.pdf.

Paulos, *Designing Personal Tele–embodiment*, IEEE International Conference on Robotics and Automation, 1998, http://www.prop.org/papers/icra98.pdf.

House Research Organization, *Telemedicine in Texas: Public Policy Concerns*, May 5, 2000, http://www.hro.house.state.tx.us/focus/telemed.pdf.

Tzafestas, *VR–based Teleoperation of a Mobile Robotic Assistant: Progress Report*, Institute of Informatics and Telecommunications, DEMO 2000/13, NCSR "Demokritos", 2000, http://users.softlab.ece.ntua.gr/~ktzaf/Publications/KTzaf_DEMO_2000_13.pdf.

West et al., *Design of Ball Wheel Mechanisms for Omnidirectional Vehicles With Full Mobility and Invariant Kinematics*, Journal of Mechanical Design, vol. 119, pp. 153–161, Jun. 1997.

Simmons, Xavier: *An Autonomous Mobile Robot on the Web*, IEEE Robotics and Automation Magazine, 1999, pp. 43–48.

US 6,925,357 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims 1–46, 48–51, 56–59, 64–67 and 72–75 are can-
celled.

Claims 47, 52, 53, 55, 60–63, 68, 69, 71 and 76–78 are
determined to be patentable as amended.

Claims 54 and 70, dependent on an amended claim, are
determined to be patentable.

New claims 79–94 are added and determined to be patent-
able.

**47.** A robot system, comprising:

a mobile robot that has a camera and a monitor;

a first remote station that can access said mobile robot;

a second remote station that can access said mobile robot;
and,

an arbitrator that can control access to said mobile robot
by said first and second remote stations, *said arbitrator
includes a notification mechanism that warns a present
user that access to said mobile robot will be terminated
because another user with higher priority wants access
to said mobile robot.*

**52.** The system of claim **47**, wherein said first and second
remote stations each have a *class* priority and said arbitrator
provides robot access to said remote station with a highest
priority.

**53.** The system of claim **52**, wherein said first and second
remote stations may be given *said class* priority as a local
user, a doctor, a caregiver, a family member, a service user or
another mobile robot.

**55.** A robot system, comprising:

a mobile robot that has a camera and a monitor;

a first remote station that can access said mobile robot;

a second remote station remote station that can access said
mobile robot; and,

arbitration means for controlling access to said mobile
robot by said first and second remote stations, *said
arbitration means includes notification means for
warning a present user that access to said mobile robot
will be terminated because another user with higher
priority wants access to said mobile robot.*

**60.** The system of claim **55**, wherein said first and second
remote stations each have a *class* priority and said [arbitra-
tor] *arbitration* means provides robot access to said remote
station with a highest priority.

**61.** The system of claim **60**, wherein said first and second
remote stations may be given *said class* priority as a local
user, a doctor, a caregiver, a family member, a service user or
another mobile robot.

**2**

**62.** The system of claim **55**, wherein said [arbitrator] *arbi-
tration* means is located within said robot.

**63.** A robot system, comprising:

a broadband network;

a mobile robot that is coupled to said broadband network,
and has a camera and a monitor;

a first remote station that can access said mobile robot
through said broadband network;

a second remote station that can access said mobile robot
through said broadband network; and,

an arbitrator that can control access to said mobile robot
by said first and second remote stations, *said arbitrator
includes a notification mechanism that warns a present
user that access to said mobile robot will be terminated
because another user with higher priority wants acess
to said mobile robot.*

**68.** The system of claim **63**, wherein said first and second
remote stations each have a *class* priority and said arbitrator
provides robot access to said remote station with a highest
priority.

**69.** The system of claim **68**, wherein said first and second
remote stations may be given *said class* priority as a local
user, a doctor, a caregiver, a family member, a service user or
another mobile robot.

**71.** A robot system, comprising:

a broadband network;

a mobile robot that is coupled to said broadband network,
and has a camera and a monitor;

a first remote station that can access said mobile robot
through said broadband network;

a second remote station that can access said mobile robot
through said broadband network; and,

arbitration means for controlling access to said robot by
said first and second remote stations, *said arbitration
means includes notification means for warning a
present user that access to said mobile robot will be
terminated because another user with higher priority
wants access to said mobile robot.*

**76.** The system of claim **71**, wherein said first and second
remote stations each have a *class* priority and said [arbitra-
tor] *arbitration* means provides robot access to said remote
station with a highest priority.

**77.** The system of claim **76**, wherein said first and second
remote stations may be given *said class* priority as a local
user, a doctor, a caregiver, a family member, a service user or
another mobile robot.

**78.** The system of claim **71**, wherein said [arbitrator] *arbi-
tration* means is located within said robot.

*79. A robot system, comprising:*

*a mobile robot that has a camera and a monitor;*

*a first remote station that can access said mobile robot;*

*a second remote station that can access said mobile robot;
and,*

*an arbitrator that can control access to said mobile robot
by said first and second remote stations, said arbitrator
includes a call back mechanism that informs a user that
was denied access to said mobile robot that said mobile
robot can be accessed.*

*80. The system of claim 79, wherein said first and second
remote stations each have a class priority and said arbitra-
tor provides robot access to said remote station with a high-
est priority.*

*81. The system of claim 80, wherein said first and second
remote stations may be given said class priority as a local
user, a doctor, a caregiver, a family member, a service user
or another mobile robot.*

**Exhibit 1 Page 23 of 24**

US 6,925,357 C1

3

82. The system of claim 79, wherein said arbitrator is located within said robot.

83. A robot system, comprising:

a mobile robot that has a camera and a monitor;

a first remote station that can access said mobile robot;

a second remote station that can access said mobile robot; and,

arbitration means for controlling access to said mobile robot by said first and second remote stations, said arbitration means includes call back means for providing a message to one of said remote stations that was denied access to said mobile robot that said mobile robot can be accessed.

84. The system of claim 83, wherein said first and second remote stations each have a class priority and said arbitration means provides robot access to said remote station with a highest priority.

85. The system of claim 84, wherein said first and second remote stations may be given said class priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

86. The system of claim 83, wherein said arbitration means is located within said robot.

87. A robot system, comprising:

a broadband network;

a mobile robot that is coupled to said broadband network, and has a camera and a monitor;

a first remote station that can access said mobile robot through said broadband network;

a second remote station that can access said mobile robot through said broadband network; and,

an arbitrator that can control access to said mobile robot by said first and second remote stations, said arbitrator includes a call back mechanism that informs a user that was denied access to said mobile robot that said mobile robot can be accessed.

4

88. The system of claim 87, wherein said first and second remote stations each have a class priority and said arbitrator provides robot access to said remote station with a highest priority.

89. The system of claim 88, wherein said first and second remote stations may be given said class priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

90. The system of claim 87, wherein said arbitrator is located within said robot.

91. A robot system, comprising:

a broadband network;

a mobile robot that is coupled to said broadband network, and has a camera and a monitor;

a first remote station that can access said mobile robot through said broadband network;

a second remote station that can access said mobile robot through said broadband network; and,

arbitration means for controlling access to said robot by said first and second remote stations, said arbitration means includes call back means for providing a message to one of said remote stations that was denied access to said mobile robot that said mobile robot can be accessed.

92. The system of claim 91, wherein said first and second remote stations each have a priority and said arbitration means provides robot access to said remote station with a highest priority.

93. The system of claim 92, wherein said first and second remote stations may be given priority as a local user, a doctor, a caregiver, a family member, a service user or another mobile robot.

94. The system of claim 91, wherein said arbitration means is located within said robot.

*   *   *   *   *

# EXHIBIT 2

US006346962B1

(12) **United States Patent**

Goodridge

(10) **Patent No.:** **US 6,346,962 B1**

(45) **Date of Patent:** **Feb. 12, 2002**

(54) **CONTROL OF VIDEO CONFERENCING SYSTEM WITH POINTING DEVICE**

(75) Inventor: **Steven Goodridge**, Cary, NC (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/032,132**

(22) Filed: **Feb. 27, 1998**

(51) Int. Cl.[7] ............................................ H04N 7/14

(52) U.S. Cl. ................................ 348/14.05; 348/14.03; 348/14.07

(58) Field of Search ............................ 348/14–20, 211, 348/212–214; 379/93.21, 102.01, 102.02, 202; 709/204; 345/326–330; 396/55, 406

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,473,680 A | 12/1995 | Porter | 379/201 |
| 5,506,954 A | 4/1996 | Arshi et al. | 395/162 |
| 5,515,099 A | 5/1996 | Cortjens et al. | 348/15 |
| 5,594,859 A | 1/1997 | Palmer et al. | 395/330 |
| 5,598,209 A | 1/1997 | Cortjens et al. | 348/211 |
| 5,617,539 A | 4/1997 | Ludwig et al. | 395/200.02 |
| 5,650,831 A | 7/1997 | Farwell | 348/734 |
| 5,657,096 A | 8/1997 | Lukacs | 348/585 |
| 5,657,246 A * | 8/1997 | Hogan et al. | 348/14 |
| 5,678,068 A * | 10/1997 | Hirano et al. | 396/55 |
| 5,704,042 A | 12/1997 | Hester et al. | 395/200.34 |
| 5,872,594 A * | 2/1999 | Thompson | 348/213 |
| 6,084,583 A * | 7/2000 | Gerszberg et al. | 345/327 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| JP | 02197831 A | * | 8/1990 | 396/406 |
| JP | 4361493 | | 12/1992 | H04N/5/94 |
| JP | 5333836 | | 12/1993 | |
| JP | 5333839 | | 12/1993 | G09G/5/08 |
| JP | 5333840 | | 12/1993 | G09G/5/08 |
| JP | 5336463 | | 12/1993 | H04N/5/45 |
| JP | WO9407327 | | 3/1994 | H04N/5/232 |
| JP | 07095549 | | 6/1994 | H04N/7/14 |
| JP | 1091385 | | 6/1995 | H04N/7/15 |
| JP | 10200807 | | 1/1997 | H04N/5/232 |
| JP | 9506217 | | 6/1997 | H04N/7/15 |
| JP | 99231 | | 9/1997 | H04N/7/15 |

* cited by examiner

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—George Eng
(74) *Attorney, Agent, or Firm*—Myers, Bigel, Sibley & Sajovec, P.A.

(57) **ABSTRACT**

Methods, systems or apparatus and computer program products are provided that control the operation of a camera in a video conferencing system. In particular, the setup and display of video information in a video conferencing system may be controlled by displaying a graphic user interface associated with the setup of the video conferencing system which includes an icon corresponding to input from a pointing device so as to provide computer generated visual feedback as to a screen location corresponding to a location of the pointing device and displaying video information so as to replace substantially all of the displayed graphic user interface including the icon. When displaying video information, control of the video information displayed is based upon user input from a pointing device without displaying an icon corresponding to the pointing device. Furthermore, the camera movement may be controlled in real time based on pointing device input such as movement.

**21 Claims, 9 Drawing Sheets**



Figure 1





## Figure 2A

Case 2:11-cv-09185-PA-AJW   Document 1   Filed 11/04/11   Page 40 of 56   Page ID #:44

32



44

Figure 2B



## Figure 2C

32

48



Figure 2D

**U.S. Patent**          Feb. 12, 2002          Sheet 6 of 9          US 6,346,962 B1



Figure 3

# FIG. 4



Figure 5

Case 2:11-cv-09185-PA-AJW   Document 1   Filed 11/04/11   Page 46 of 56   Page ID #:50



# Figure 6

US 6,346,962 B1

| 1 | 2 |

# CONTROL OF VIDEO CONFERENCING SYSTEM WITH POINTING DEVICE

## FIELD OF THE INVENTION

The present invention relates generally to video conferencing systems and more particularly to the control of the display of a video conferencing system.

## BACKGROUND OF THE INVENTION

With increases in network bandwidth, video conferencing has become more accessible and less costly. For example, many current video conferencing systems allow for video conferencing over an ISDN connection. These video conferencing systems typically utilize a personal computer at each side of an Integrated Switched Digital Network (ISDN) connection to capture and transmit and receive and reproduce audio and video information.

Because these systems are often based on personal computers, these systems typically utilize a graphic user interface to provide control panels and other interfaces for operation. These graphic user interfaces often use a pointing device with an on-screen icon representing the position of the pointing device to control their operation.

Possibly because of the close connection between personal computers and video conferencing systems, many video conferencing systems utilize elements of graphic user interfaces when displaying video information. In some cases, the video information is incorporated into a graphic user interface in the form of a window which only covers a portion of the displayable area of a screen. In other cases, elements of the graphic user interface are incorporated into a predominantly video display.

While graphic user interfaces have made use of personal computers more intuitive, they may still be intimidating and confusing to some users. The combination of graphic user interface elements with video information may also clutter the screen and distract the user from the typically more important video information being presented. Furthermore, the combination of video information with computer generated information may complicate the display process as well as decrease the efficiency with which video information may be displayed and increase the complexity of video conferencing system development.

U.S. Pat. Nos. 5,515,099 and 5,598,209 are examples of conventional hybrid systems which utilize both computer generated and video information in a display. In these patents motion of a camera is controlled by moving an icon over a video image and then selecting the direction to point the camera. However, this two-step process may not be intuitive and may undesirably incorporate computer generated information into a video image and may result in clutter of the screen associated with such a hybrid display.

Accordingly, a need exists for improvement in the control of video conferencing systems that can reduce clutter and confusion among users and can simplify the development of video conferencing systems.

## SUMMARY OF THE INVENTION

In view of the above discussion, it is an object of the present invention to provide for control of a video conferencing system which is intuitive to a user.

A further object of the present invention is to provide for control of a video conferencing system which does not require computer generated information to be displayed simultaneously with video information.

Still another object of the present invention is to provide for control of a video conferencing system which does not require information to be displayed unrelated to the video images of the conference which clutter the display.

These and other objects of the present invention are provided by methods, systems or apparatus and computer program products that control the setup and display of video information in a video conferencing system by displaying a graphic user interface associated with the setup of the video selections. Thus, the user interface for the video conferencing system may be simplified. Furthermore, by utilizing movement or selection of the pointing device without displaying a pointing device icon, the present invention provides for control of video information in a video conferencing system without the need to combine computer generated information with the video information. Also, because the video information display does not include elements of the graphic user interface, the video display reduces the screen clutter, reduces distractions and maximizes the area of the screen for displaying the information of highest importance. Finally, the present invention provides for a more intuitive control of camera movement by coupling the movement of the camera directly to the pointing device movement or to simple selections with the pointing device buttons or other selection devices.

In a particular embodiment of the present invention, the operation of a video conferencing system is controlled by controlling in real time the operation of a camera which provides video to be displayed through input to a pointing device so as to provide direct control of the motion of the camera through movement of the pointing device. In further embodiments, the operation of a graphic user interface is also controlled by the pointing device by displaying an icon corresponding to the position of the pointing device with respect to the graphic user interface so as to provide computer generated visual feedback as to the screen location corresponding to the location of the conferencing system which includes an icon corresponding to input from a pointing device so as to provide computer generated visual feedback as to a screen location corresponding to a location of the pointing device and displaying video information so as to replace substantially all of the displayed graphic user interface including the icon. When displaying video information, control of the video information displayed is based upon user input from a pointing device without displaying an icon corresponding to the pointing device.

The control of the display of video information may include receiving user input from the pointing device without displaying computer generated visual feedback of the user input and repositioning a remote camera associated with the video conferencing system based upon the user input from the pointing device. Similarly, the control of the video information may include controlling the source of the video information displayed based upon input from the pointing device including selecting for display a source of video information from a plurality of video information sources based upon input from the pointing device. Furthermore, the arrangement of the display of video information from multiple video information sources may also be controlled by the pointing device.

In particular embodiments of the present invention, the repositioning of the camera may be achieved by receiving input from the pointing device corresponding to movement of the pointing device to provide movement data. A timer is initiated upon receipt of the movement data and a camera associated with the video conferencing system actuated in a direction indicated by the movement data. Motion of the

US 6,346,962 B1

3

camera is stopped if the timer expires without receiving subsequent movement data.

In another embodiment of the present invention, the field of view of the camera may be zoomed in or out in response to user input from the pointing device. In particular, the zooming may be accomplished by receiving input from the pointing device corresponding to activation of a first selection device of the pointing device and actuating a camera associated with the video conferencing system so as to zoom the camera in a first direction in response to the activation of the first selection device. Input is also received from the pointing device corresponding to de-activation of the first selection device of the pointing device and the zoom of the camera is stopped in response to the received input corresponding to the de-activation of the first selection device.

In another embodiment of the present invention if input from the pointing device corresponding to activation of a predefined selection device of the pointing device then the video information is replaced with the graphic user interface and the icon in response to the input.

Thus, the invention recognizes that movement of the camera provides feedback to the user so that a separate icon is not necessary to confirm user pointing device during setup of the video conferencing system.

In still another embodiment of the present invention, the camera is controlled by receiving input from the pointing device corresponding to movement of the pointing device and actuating the camera associated with the video conferencing system in a direction indicated by the movement of the pointing device. Furthermore, a timer may be initiated upon receipt of the movement data and the motion of the camera stopped if the timer expires without receiving subsequent movement data. Similarly, zooming of the camera may be controlled directly through pointing device input. Likewise, the source and arrangement of video information in a display may be controlled directly from pointing device input.

As will be appreciated by those of skill in the art, the present invention may be embodied as methods, apparatus or computer program products.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram illustrating a video conferencing system according to the present invention;

FIGS. 2A through 2D are illustrations of displays utilizing the present invention;

FIG. 3 is a flow chart illustrating operation of one embodiment of the present invention;

FIG. 4 is a flow chart illustrating operation of one embodiment of the present invention when a selection button is depressed on a pointing device;

FIG. 5 is a flow chart illustrating operation of one embodiment of the present invention when movement of the pointing device is detected; and

FIG. 6 is a flow chart illustrating operation of one embodiment of the present invention for terminating camera movement initiated by movement of the pointing device.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention now will be described more fully hereinafter with reference to the accompanying drawings, in which preferred embodiments of the invention are shown. This invention may, however, be embodied in many different

4

forms and should not be construed as limited to the embodiments set forth herein; rather, these embodiments are provided so that this disclosure will be thorough and complete, and will fully convey the scope of the invention to those skilled in the art. Like numbers refer to like elements throughout. As will be appreciated by one of skill in the art, the present invention may be embodied as methods or devices.

As will be appreciated by one of skill in the art, the present invention may be embodied as a method, video conferencing system, or computer program product. Accordingly, the present invention may take the form of an entirely hardware embodiment, an entirely software embodiment or an embodiment combining software and hardware aspects. Furthermore, the present invention may take the form of a computer program product on a computer-readable storage medium having computer-readable program code means embodied in the medium. Any suitable computer readable medium may be utilized including hard disks, CD-ROMs, optical storage devices, or magnetic storage devices.

FIG. 1 illustrates one embodiment of the present invention. As seen in FIG. 1, a video conferencing system 10 includes a first video conference station 12 and a second video conference station 14. The video conference stations 12 and 14 communicate over a communication network 16. The communication network 16 may be local area network, a wide area network, the Internet, a public telephone system or the like. The video conference stations 12 and 14 share video, audio and other information over network 16.

The video conference stations 12 and 14 may be essentially the same and may include a processing system 22 such as a personal computer or workstation. The processing system may control one or more displays 22 and a video camera 24 for capturing video information to be sent to the other video conference station for display. While the video conference stations illustrated in FIG. 1 illustrate a single display 20, as will be appreciated by those of skill in the art, multiple displays may be utilized. Furthermore, the displays may be computer graphics displays utilizing video standards such as the VGA or SVGA standards or may be video monitors utilizing, for example, the NTSC of PAL video standards.

The video conference stations 12 and 14 may also obtain input from a microphone 26 to obtain audio information. The data processing system may also receive user input from one or more input devices such as a pointing device 28 or keyboard 30. The pointing device may be a mouse, a trackball or the like. However, the pointing device preferably includes both movement devices (e.g. trackball) as well as selection devices such as buttons. In a preferred embodiment of the present invention, the pointing device includes three buttons for selection purposes.

In operation, the video conference stations 12 and 14 obtain audio information from microphone 26 and video information from camera 24 and transmit the audio and video information between the processing systems 20 over network 16. The processing systems 20 receive the audio and video information and present the audio information to the user through a loudspeaker and the video information through a display device 20 such as a CRT or other display.

According to the present invention, camera 24 may also be controlled by processing system 20 either locally or remotely from other video conference stations. The present invention provides for control of camera movement and display selection utilizing the pointing device 28.

**Exhibit 2 Page 12 of 16**

US 6,346,962 B1

5

FIGS. 2A through 2D illustrate displays which may be provided to a user on display 22 utilizing a video conferencing system according to the present invention. FIG. 2A illustrates a setup screen which includes computer generated information for establishing or controlling a video conference session. As seen in FIG. 2A, display screen 32 includes computer generated information such as a camera control panel 34, a conference control panel 36 and a display control panel 38. The display 32 may also include video information 40. Control of the setup screen is provided by the pointing device 28 which has a corresponding computer generated icon 42 which corresponds to a position of the pointing device 28 on the screen 32. Selections are made by using the movement device of the pointing device 28 and then depressing or "clicking" one of the selection devices or buttons of the pointing device 28.

Mechanisms for obtaining pointing device input and operating on that input in operating systems such as International Business Machine's OS/2® or Microsoft's Windows® or Windows95® are well understood by those of skill in the art. Furthermore, modification of the functions carried out as a result of pointing device input are within the capabilities of one of skill in the art and, therefore, will not be discussed in detail herein. Accordingly, it will be understood that, by describing the functions carried out upon input from the pointing device, those functions could be readily implemented by one of skill in the art.

As seen in FIG. 2A, the screen 32 includes both video and computer generated information. However, according to the present invention, a user may select a "conference view" which eliminates all or substantially all of the computer generated information and displays primarily or exclusively video information on display screen 32. Such a mode of the video conferencing system may be entered by, for example, moving the icon corresponding to the location of the pointing device over the "Go to Conference View" button and depressing a selection button of the pointing device.

FIG. 2B illustrates one mode of the Conference View. As seen in FIG. 2B, display screen 32 is completely utilized by video information to provide video display 44. Furthermore, no icon representing the position of the pointing device 28 is provided. Thus, when entering Conference View, the setup screen is replaced by video information so as to provide a video display without computer generated feedback as to the position of the pointing device 28.

Despite the presentation of video information without an icon representing the pointing device, the information provided on display screen 32 may still be manipulated or controlled utilizing pointing device 28. Thus, if the pointing device 28 is moved, for example by rolling a trackball or sliding a mouse, the camera corresponding to the video information displayed may pan or tilt in response to the movement of the pointing device 28. If the pointing device 28 is moved side-to-side the camera will pan and if the pointing device 28 is moved forward and backward the camera will tilt. Combinations of side-to-side and forward or backward movement produces the corresponding pan and tilt of the camera.

Similarly, by depressing buttons on the pointing device 28, the camera may be zoomed in or zoomed out. For example, with a three button pointing device, the left button may cause the camera to zoom in while the button is depressed. Similarly, when the middle button of the pointing device is depressed, the camera may zoom out while the button is depressed. Thus, all aspects of camera movement which may be remotely controlled may be controlled

6

directly in real time by the pointing device. As used herein, the term "real time" control refers to the operation of the camera directly by a single action of the pointing device. Thus, for example, the motion of the camera directly based on the motion of the pointing device without depressing a button or otherwise requiring further user input would be considered "real time" control.

By providing for real time pointing device movement based camera movement control, the present invention provides for control of the video information displayed by a video conferencing system without the inclusion of distracting pointing device icons or other computer generated feedback mechanisms. Such a control mechanism also allows for display of video only information which may increase system performance and reduce system complexity by reducing the circumstances where computer generated information and video information are combined in a single display screen. Furthermore, by eliminating the need for graphic user interface elements, the present invention may provide for increased size of the displayed video information (e.g. full screen video).

FIG. 2C illustrates another mode of the conference view which includes a picture-in-picture (PIP) window of video information from a secondary video source, such as a local camera or a camera at a third video conferencing station. As seen in FIG. 2C, the display screen 32 includes the original video information 44 of FIG. 2B and video information from another source in the PIP window 46. This PIP view may also be controlled by pointing device 28 without the need for the display of computer generated information. Similarly, FIG. 2D illustrates another conference view mode where the video information 48 from the PIP window 46 is displayed full screen on display screen 32.

Each of these alternative display modes may also be controlled by the pointing device without the need for the display of computer generated information associated with controlling the video information displayed. For example, by depressing a button on the pointing device 28, such as the right button in a three button device, the various video display modes may be cycled through in a rotating pattern. Thus, depressing the right button once may move from the display of FIG. 2B to the display of FIG. 2C. Depressing the button again may cause the display to change from FIG. 2C to the display of FIG. 2D. As will be appreciated by those of skill in the art, any number of alternative displays may be cycled through in a repeating pattern so as to provide the desired flexibility of the video conferencing system. Furthermore, by "double clicking" the right button, the setup display of FIG. 2A may be returned to at any time to allow for modification of the parameters of the video conference.

Operations for various aspects of one embodiment of the present invention are illustrated in detail in FIGS. 3 through 6 which are flowchart illustrations. It will be understood that each block of the flowchart illustrations, and combinations of blocks in the flowchart illustrations, can be implemented by computer program instructions. These computer program instructions may be provided to a processor or other programmable data processing apparatus to produce a machine, such that the instructions which execute on the processor or other programmable data processing apparatus create means for implementing the functions specified in the flowchart block or blocks. These computer program instructions may also be stored in a computer-readable memory that can direct a processor or other programmable data processing apparatus to function in a particular manner, such that the instructions stored in the computer-readable memory produce an article of manufacture including instruction means which implement the functions specified in the flowchart block or blocks.

US 6,346,962 B1

7 8

Accordingly, blocks of the flowchart illustrations support combinations of means for performing the specified functions, combinations of steps for performing the specified functions and program instruction means for performing the specified functions. It will also be understood that each block of the flowchart illustrations, and combinations of blocks in the flowchart illustrations, can be implemented by special purpose hardware-based computer systems which perform the specified functions or steps, or by combinations of special purpose hardware and computer instructions.

FIG. 3 illustrates the overall operation of a video conferencing system utilizing the present invention. As seen in FIG. 3, when the system is initially started, the setup screen is displayed which includes an icon representing the location of a pointing device to provide visual feedback of the location of the pointing device (block 50). During the setup the pointing device operates as a conventional pointing device in a graphic user interface. The setup screen may remain displayed until setup mode is exited (block 52). When setup is completed if there is no video information to display then the video conference system is not being utilized and the process ends (block 54).

However, if video information is available for display (block 54), then the setup screen, including the pointing device icon, is replaced with the video display (block 56). When the video information is displayed the operation of the pointing device is as described above with respect to FIGS. 2A through 2D and no icon or other computer generated image corresponding to the pointing device are displayed. If, however, further setup of the video conferencing system is required (block 58) then the setup screen is redisplayed (block 50) and operation o of the pointing device returns to conventional operation.

The operation of the pointing device will now be described in more detail with reference to FIG. 4 through FIG. 6. As seen in FIG. 4, when a selection device of the pointing device is activated (e.g. a button depressed) if the setup screen is active (block 60), then a conventional pointer function of a graphic user interface is carried out (block 62). If, however, the setup screen is not active (block 64), then the video display is active. If the right button is depressed during the video display mode (block 64), then it is determined if the activation was a "double click" event (block 66).

If the event was a double click, then the video conferencing system enters setup mode (block 68) and the setup screen is redisplayed. If the event was not a double click event (block 66), then the video display is cycled to the next format in the rotation (block 70).

If the pointer device action was not a right button activation, then the video conferencing system determines if the left button event has occurred (block 72). If a left button event has occurred then the video conferencing system determines if it was a button depressed event (i.e. activation of the button) (block 74). If the left button was depressed then the camera is actuated to zoom in (block 77). If the action was a left button event (block 72) but was not a button depressed event (block 74) then the event was a left button release (i.e. de-activation of the left button) and the zoom of the camera is stopped.

Returning to block 72, if the button event was not a left button event, then the action was a center button event and the video conferencing system determines if it was a button depressed event (i.e. activation of the button) (block 75). If the center button was depressed then the camera is actuated to zoom out (block 78). If the action was not a left button

event (block 72) but was not a button depressed event (block 75) then the event was a center button release (i.e. de-activation of the center button) and the zoom of the camera is stopped.

The operation of a video conferencing system according to the present invention as a result of movement of the pointing device 28 are illustrated in FIG. 5. As seen in FIG. 5, when a pointing device movement event occurs, the video conferencing system determines if the setup screen is active (block 80). If the setup screen is active, then it is determined if the position of the pointing device corresponds to a position on the screen (block 82). If the pointing device is on the screen then the icon representing the pointing device location is moved to the pointing device location based on the movement of the pointing device (block 84). If the location of the pointing device is not on the screen, then the icon representing the position of the pointing device is relocated to the edge of the screen corresponding to the nearest point to the location of the pointing device and the position of the pointing device is set to this location (block 86).

If the setup screen is not active (block 80), then a timer associated with the movement is either started (block 92) of reset (block 90) depending on whether a timer had been previously started (block 88). After this initialization of the timer, the video conferencing system determines the direction of motion of the pointing device (block 94). The camera is then actuated to move in the direction indicated by the pointing device movement (block 96). The position of the pointing device is then reset to the center of the screen (block 98). The resetting of the position of the pointing device prevents a user from positioning the pointing device off screen which may limit the range of motion for a pointing device in some operating systems.

As has been discussed above with respect to pointing device motion, a timer is started based on the event. The operations associated with the motion timer are illustrated in FIG. 6. As seen in FIG. 6, if the timer has not expired (block 100) the action of the camera is maintained (block 104). This corresponds to maintaining the motion of the camera for a finite period of time based on any pointing device input. Once the timer expires (block 100) the action of the camera is stopped (block 102). A timer duration of less than about 100 milliseconds may be used for many operations, however, the timer duration may be programmable and values of from about 5 milliseconds to about 500 milliseconds may be suitable. Actual timer values may also depend on whether pointing device input is queued and the rate at which pointing device input is available. The use of timer tends to smooth the operation of the camera in response to input from the pointing device.

While the present invention has been described with respect to particular pointing device actions, as will be appreciated by those of skill in the art, other actions resulting from pointing device actions may be utilized while still benefitting from the teachings of the present invention.

Furthermore, while the present invention has been described with respect to the use of a timer associated with pointing device motion, such a timer may be unnecessary in a system where pointing device motion may be directly captured such as the DirectInput feature of Microsoft's DirectX programming interface for Windows95®. In such a case the starting and stopping of motion of the pointing device may be directly captured by application programs, thus avoiding the need for a timer to determine if motion of the pointing device has been stopped.

US 6,346,962 B1

9

10

The foregoing is illustrative of the present invention and is not to be construed as limiting thereof. Although a few exemplary embodiments of this invention have been described, those skilled in the art will readily appreciate that many modifications are possible in the exemplary embodiments without materially departing from the novel teachings and advantages of this invention. Accordingly, all such modifications are intended to be included within the scope of this invention as defined in the claims. In the claims, means-plus-function clause are intended to cover the structures described herein as performing the recited function and not only structural equivalents but also equivalent structures. Therefore, it is to be understood that the foregoing is illustrative of the present invention and is not to be construed as limited to the specific embodiments disclosed, and that modifications to the disclosed embodiments, as well as other embodiments, are intended to be included within the scope of the appended claims. The invention is defined by the following claims, with equivalents of the claims to be included therein.

That which is claimed is:

1. A method of controlling operations of a video conferencing system, the method comprising the steps of:

controlling in real time the operation of a camera which provides video to be displayed through input to a pointing device so as to provide direct control of the motion of the camera through movement of the pointing device, wherein said step of controlling comprises the steps of:

receiving input from the pointing device corresponding to movement of the pointing device to provide movement data;

actuating the camera associated with the video conferencing system in a direction indicated by the movement data;

initiating a timer upon receipt of the movement data; and

stopping motion of the camera if the timer expires without receiving subsequent movement data.

2. A method according to claim 1, further comprising the step of controlling the operation of a graphic user interface by displaying an icon corresponding to the position of a pointing device with respect to the graphic user interface so as to provide computer generated visual feedback as to the screen location corresponding to the location of the pointing device during setup of the video conferencing system.

3. A method according to claim 1 wherein said step of controlling comprises zooming the field of view of the camera in response to user input from the pointing device.

4. A method according to claim 3, wherein said step of zooming comprises the steps of:

receiving input from the pointing device corresponding to activation of a first selection device of the pointing device;

actuating a camera associated with the video conferencing system so as to zoom the camera in a first direction in response to the received input corresponding to the activation of the first selection device;

receiving input from the pointing device corresponding to de-activation of the first selection device of the pointing device; and

stopping the zoom of the camera in response to the received input corresponding to the de-activation of the first selection device.

5. A method according to claim 1, further comprising the step of controlling the source of the video information displayed based upon input from the pointing device.

6. A method according to claim 5, wherein said step of controlling the source of video information comprises the step of selecting for display a source of video information from a plurality of video information sources based upon input from the pointing device.

7. A method according to claim 1, further comprising the step of controlling the arrangement of the display of video information from multiple video information sources.

8. A system for controlling operations of a video conferencing systems comprising:

a camera capable of remote control operation; and

means for controlling in real time the operation of the camera which provides video to be displayed through input to a pointing device so as to provide direct control of the motion of the camera through movement of the pointing device, wherein said means for controlling comprise:

means for receiving input from the pointing device corresponding to movement of the pointing device to provide movement data;

means for actuating the camera associated with the video conferencing system in a direction indicated by the movement data;

means for initiating a timer upon receipt of the movement data; and

means for stopping motion of the camera if the timer expires without receiving subsequent movement data.

9. A system according to claim 8, further comprising means for controlling the operation of a graphic user interface by displaying an icon corresponding to the position of a pointing device with respect to the graphic user interface so as to provide computer generated visual feedback as to the screen location corresponding to the location of the pointing device during setup of the video conferencing system.

10. A system according to claim 8 wherein said means for controlling further comprises means for zooming the field of view of the camera in response to user input from the pointing device.

11. A system according to claim 10, wherein said means for zooming comprises:

means for receiving input from the pointing device corresponding to activation of a first selection device of the pointing device;

means for actuating the camera so as to zoom the camera in a first direction in response to the received input corresponding to the activation of the first selection device;

means for receiving input from the pointing device corresponding to de-activation of the first selection device of the pointing device; and

means for stopping the zoom of the camera in response to the received input corresponding to the de-activation of the first selection device.

12. A system according to claim 8, further comprising means for controlling the source of the video information displayed based upon input from the pointing device.

13. A system according to claim 12, wherein said means for controlling the source of video information comprises means for selecting for display a source of video information from a plurality of video information sources based upon input from the pointing device.

14. A system according to claim 8, further comprising means for controlling the arrangement of the display of video information from multiple video information sources.

US 6,346,962 B1

11

**15.** A computer program product for controlling operations of a video conferencing system, the computer program product comprising:

a computer-readable storage medium having computer-readable program code means embodied in said medium, said computer-readable program code means comprising:

computer-readable program code means for controlling in real time the operation of a camera which provides video to be displayed through input to a pointing device so as to provide direct control of the motion of the camera through movement of the pointing device, wherein said computer readable code means for controlling comprise:

computer readable code means for receiving input from the pointing device corresponding to movement of the pointing device to provide movement data;

computer readable code means for actuating the camera associated with the video conferencing system in a direction indicated by the movement data;

computer readable code means for initiating a timer upon receipt of the movement data; and

computer readable code means for stopping motion of the camera if the timer expires without receiving subsequent movement data.

**16.** A computer program product according to claim **15,** further comprising computer readable program code means for controlling the operation of a graphic user interface by displaying an icon corresponding to the position of a pointing device with respect to the graphic user interface so as to provide computer generated visual feedback as to the screen location corresponding to the location of the pointing device during setup of the video conferencing system.

**17.** A computer program product according to claim **15** wherein said computer readable program code means for controlling further comprises computer readable program

12

code means for zooming the field of view of the camera in response to user input from the pointing device.

**18.** A computer program product according to claim **17,** wherein said computer readable program code means for zooming comprises:

computer readable program code means for receiving input from the pointing device corresponding to activation of a first selection device of the pointing device;

computer readable program code means for actuating a camera so as to zoom the camera in a first direction in response to the received input corresponding to the activation of the first selection device;

computer readable program code means for receiving input from the pointing device corresponding to de-activation of the first selection device of the pointing device; and

computer readable program code means for stopping the zoom of the camera in response to the received input corresponding to the de-activation of the first selection device.

**19.** A computer program according to claim **15,** further comprising computer readable program code means for controlling the source of the video information displayed based upon input from the pointing device.

**20.** A computer program product according to claim **15,** wherein said computer readable program code means for controlling the source of video information comprises computer readable program code means for selecting for display a source of video information from a plurality of video information sources based upon input from the pointing device.

**21.** A computer program product according to claim **15,** further comprising computer readable program code means for controlling the arrangement of the display of video information from multiple video information sources.

\* \* \* \* \*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV11- 9185 PA (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

ORIGINAL

Irfan A. Lateef
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTOUCH TECHNOLOGIES, INC. D/B/A INTOUCH HEALTH, a Delaware corporation,<br><br>PLAINTIFF(S)<br><br>v.<br><br>VGO COMMUNICATIONS, INC., a Delaware corporation,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV11 - 9185 PA (AJWx)**<br><br>**SUMMONS** |

TO:   DEFENDANT(S):   VGO COMMUNICATIONS, INC.

100 Innovative Way, Suite 3321, Nashua, New Hampshire 03062

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _____Irfan A. Lateef_____, whose address is _____2040 Main Street, Fourteenth Floor, Irvine, CA 92614_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

NOV - 4 2011

Clerk, U.S. District Court

**DODJIE LAGMAN**

Dated: _____

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                                    SUMMONS

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
INTOUCH TECHNOLOGIES, INC. D/B/A INTOUCH HEALTH, a Delaware corporation

**DEFENDANTS**
VGO COMMUNICATIONS, INC., a Delaware corporation

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Craig S. Summers, Joseph S. Cianfrani, Irfan A. Lateef, Brian C. Claassen
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor, Irvine, CA 92614  Phone: (949) 760-0404

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)    To be determined

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT:** $ according to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, et seq., more particularly 35 U.S.C. § 271 and § 281

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☒ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | **REAL PROPERTY** | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

## CV11 - 9185 PA (AJWx)

**FOR OFFICE USE ONLY:**    Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): See Notice of Related Case

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　 ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　 ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　 ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Santa Barbara County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New Hampshire |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Mark Jabley_    Date _Nov. 4, 2011_

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |